IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA WHITE, | No. C05-03767 MJJ |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| COBLENTZ, PATCH, DUFFY AND BASS, LLP LONG TERM DISABILITY INSURANCE PLAN, | |
| Defendant, | |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Real Party in Interest. | |

In this action, Plaintiff Patricia White ("Plaintiff" or "White") seeks to recover long term disability ("LTD") benefits under a group employee welfare benefit plan ("the Plan") issued by Defendant Prudential Insurance Company of America ("Prudential").[1]  Plaintiff's benefit claims are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. On March 15, 2007, the Court held a bench trial on Plaintiff's claim to LTD benefits under the Plan. Prior to the trial, the parties submitted trial briefs framing the issues before the Court and identifying the evidence in support of their respective positions. After carefully considering the parties' arguments and thoroughly reviewing the administrative record, the Court makes the following findings of fact and conclusions of law.

---

[1] Docket No. 1.

**I.      Findings of Fact**

   **A.      Procedural Background**

   1.   Plaintiff is a covered employee under the Coblentz, Patch, Duffy, and Bass LLP ("Coblentz") Disability Plan.  (Doc. No. 4 at 2.)  Prudential is a fiduciary for the Plan, and the insurer for the disability policy providing benefits under the Plan.  (*Id.* at 2.)

   2.   For the first sixty months of disability, the Plan provides benefits if Plaintiff is unable to perform the material and substantial duties of her "own occupation."  (AR 0789.)

   3.   In December 1999, Plaintiff stopped working as a legal secretary at Coblentz due to pain in her hands, writs, forearms, and elbows.  Plaintiff returned to work part-time on February 28, 2000, but experienced a relapse and ceased part-time work on July 24, 2000.  (AR 0597.)

   4.   Subsequently, Plaintiff submitted a claim to Prudential for disability benefits under the Plan and Prudential approved LTD payments as of March 3, 2000.  In its approval letter, Prudential wrote, "we have completed our evaluation of your claim . . . and have determined that you meet the requirements for eligibility for benefits under the definition of Partial Disability" and that "benefits will continue under the definition of Total Disability . . . provided you remain totally disabled under the terms of the [Policy]."  (AR 0789.)

   5.   Prudential paid LTD benefits to Plaintiff from March 3, 2000 through April 30, 2004.  (AR 0601-0606.)

   6.   In a letter dated February 23, 2004, Prudential informed Plaintiff it would terminate her benefits as of May 1, 2004.  (AR 0601.)  Plaintiff appealed the decision to Prudential's review panel in May 2004 and Prudential denied her appeal.  (AR 0592, 0217.)  Plaintiff appealed again in June 2005.  (AR 0212.)  Prudential also denied that appeal.  (AR 0002.)

   7.   On September 19, 2005, Plaintiff filed a Complaint against Defendant and Prudential.  ( Doc. No. 1.)

   8.   Prudential filed its Answer on October 25, 2005.  (Doc. No. 4.)

   9.   The Court granted partial summary judgment on the issue of standard of review on March 10, 2006.  (Doc. No. 18.)  The Court found that the appropriate standard for review in this action is *de novo*.  (*Id.*)

2

10. On October 16, 2006 the Court denied the parties' cross motions for summary judgment. (Doc. No. 44.)

11. The Court conducted a bench trial on March 15, 2007. (Doc. No. 62.)

**B.     The Total Disability Provision**

12. To recover LTD benefits under the Plan, Plaintiff must establish that she is totally disabled under the Plan. The Plan's Total Disability Provision provides that:

> "Total Disability" exists when Prudential determines that all of these conditions are met:
> (1) Due to Sickness or Accidental Injury, both of these are true:
>   (a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.
>   (b) After the Initial Duration of a period of Total Disability, you are not to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.
> (2) You are not working at any job for wage or profit.
> (3) You are under the regular care of a Doctor."

(AR 0789; PLAN 009.)

**C.     Evidence Relating to Plaintiff's Qualification for LTD Benefits**

13. Plaintiff worked in clerical positions for nearly 20 years. She was most recently employed as a legal secretary at Coblentz in San Francisco, California. (AR 0172.)

14. Plaintiff stopped working on December 3, 1999 due to upper extremity pain and weakness. (AR 0008.)

15. Plaintiff attempted to return to work at Coblentz in the Information Technology ("IT") department on a part-time basis in March 2000. However, Plaintiff stopped working in that capacity in July 2000. According to the Human Resources Manager at Coblentz, Katie Weitz, Plaintiff could not do even the most limited keyboarding and was not able to use necessary resource materials due to the pain in her hands. After one year of treatment, Plaintiff still was not able to return to any position at Coblentz. (*Id.* and AR 0078)

3

### 1. William E. Billings, M.D.

16. William E. Billings, M.D., has treated Plaintiff as her primary-care physician since January 13, 2000. (AR 0126.) He has treated Plaintiff actively and sometimes intensively for bilateral upper extremity pain, swelling, muscle firmness and dysfunction. (*Id.*)

17. Dr. Billings treated Plaintiff after she attempted to return to work in 2000. After Plaintiff attempted to return to work at the rate of three full days per week, Dr. Billings reported that Plaintiff suffered a major relapse and required six months of intensive treatment. (AR 0124, 0127.)

18. Dr. Billings also reported Plaintiff another flare-up that lasted nearly one week as a result of Plaintiff sweeping her porch for five to ten minutes. (AR 0127.)

19. On February 28, 2005, Dr. Billings treated Plaintiff for significant pain, swelling and warmth of the upper one half of both forearms. Plaintiff sought treatment after mowing her side lawn for approximately fifteen to twenty minutes. Dr. Billings concluded the activity caused a major response of the myofascial tissues of the upper arm and reported that it took three to four weeks to resolve with Plaintiff still experiencing slight to moderate tenderness of both forearms. (AR 0123-0125.)

20. In a letter dated May 12, 2004, Dr. Billings offered the following assessment of Plaintiff's condition:

> At this time, I remain reasonably certain that the patient can not [sic] return to the type of work she was doing when injured, either for her former or another employer. I feel she has permanent limitations for light hand use with minimal capacity for keyboarding or hand writing. Having once tried and failed to return to that type of work, and given the intermittent flares, by symptoms and signs, that I have documented by examination, I must respectfully disagree with the consultants [sic] estimate of Ms. Whites [sic] physical capacity on 30 December 2003. She <u>does not have the capacity to perform the tasks of handling/grasping, fingering, feeling, pushing and pulling</u> "frequently" as stated. She can not do these activities repetitively without consequences.

(AR 0127-0128.) (emphasis in original)

### 2. Stephen Coleman

21. Mr. Stephen Coleman, an acupuncturist, has treated Plaintiff since early 2003. (AR 0148.)

4

22. When Plaintiff began her treatment, Coleman reported that Plaintiff could not cook, clean, perform computer work, sew, draw, or garden without pain. (*Id.*)

23. On July 29, 2004, Coleman treated Plaintiff after she underwent a Functional Capacity Examination ("FCE") on July 26, and July 27, 2004. Coleman observed swelling in Plaintiff's arms and wrists and Plaintiff reported severe pain in both of her arms, hands, wrists, and shoulders. (AR0149.)

24. On August 19, 2004 Coleman treated Plaintiff for irritation and inflammation after Plaintiff mopped her floors. Plaintiff reported pain in both wrists. Coleman reported continued soreness until September 2, 2004. (AR 0150-0151.)

### 3. Alan Zacharia, M.D.

25. Alan Zacharia, M.D., conducted an agreed medical evaluation of Plaintiff on May 2, 2001. (AR 0170-0178.)

26. As a result of his medical evaluation, Dr. Zacharia assigned Plaintiff work restrictions of no very heavy work, no prolonged work at shoulder level or above, no repetitive gripping or keyboarding, mouse, handwriting and similar activities for more than forty-five minutes per hour, not to exceed a total of sixty percent of her workday. (AR 0176.)

27. Dr. Zacharia also precluded Plaintiff from gripping objects greater than one-and-a-half inches and weighing more than one pound. (*Id.*)

### 4. John Chu, M.D.

28. On November 17, 2003, John Chu, M.D., an orthopedic specialist, performed a "complete orthopedic evaluation" of Plaintiff at the request of the Department of Social Services. (AR 0291 - 0296.)

29. Dr. Chu's report indicates that he reviewed notes from Dr. Billings including one dated July 24, 2003, another dated May 9, 2002, and a lab note dated July 24, 2000. (AR 0291.) Dr. Chu incorrectly stated Plaintiff stopped working in June 2001. (AR 0292.)

30. Dr. Chu wrote that Plaintiff's "symptoms are most consistent with repetitive stress injury." (AR 0295.)

31. Relying on Plaintiff's history and his examination, Dr. Chu opined that Plaintiff "can

5

lift or carry 50 lbs occasionally and 25 lbs frequently.  She can stand or walk 6 hours out of an 8-hour workday and sit 6 hours out of an 8-hour workday.  In addition, she may have some difficulty reaching all directions due to her shoulder discomfort and she may have some difficulty with gross and fine manipulation due to her elbow and wrist discomfort." (AR 0296.)

### 5. Bernard Stevens, M.D.

32. On December 20, 2003, Bernard Stevens, M.D., whose specializes in internal medicine and endocrinology, performed a medical file review at the request of Prudential.  Dr. Stevens did not physically examine the Plaintiff.  He reviewed Plaintiff's medical records including Dr. Chu's report.  Dr. Stevens wrote that Plaintiff "was noted to be able to mop floors, paint, knit, cook and prune roses in the notes submitted by the acupuncture specialist."  (AR 0284.)

33. Dr. Stevens found Dr. Chu performed the most current and thorough evaluation of Plaintiff but said there were "few significant findings demonstrated."  (*Id.*)

34. Dr. Stevens reviewed progress notes from Dr. Billings but found they "did not convey any detailed functional information regarding the claimant's upper extremities."  (*Id.*)

35. Ultimately, Dr. Stevens opined that Plaintiff had "some mild pain in her upper extremities" and "at the very least, can do light work with some upper extremity limitations."  (*Id.*)

36. Dr. Stevens completed an physical capacities estimation form ("PCE) for Plaintiff.  The PCE consisted of questions with check boxes for Dr. Stevens to record his opinion.  Dr. Stevens indicated that Plaintiff's sitting, standing, and walking was "not restricted by condition" and that Plaintiff could carry or exert force up to twenty pounds and frequently lift and carry up to ten pounds.  Dr. Stevens also indicates Plaintiff could perform the following activities "frequently": (1) handling/grasping; (2) fingering; (3) feeling; (4) pushing/pulling; (5) climbing; (6) stooping; (7) kneeling; (8) balance; (9) crouching; (10) reaching above shoulders; (11) reaching forward more than eighteen inches; and (12) reaching forward less than eighteen inches.  Dr. Stevens also indicates Plaintiff could crawl "occasionally."  (AR 0285-0286.)

### 6. Louis P. Szollosy

37. On February 18, 2004, Louis P. Szollosy, a vocational counselor, conducted a vocational assessment at Prudential's request.  Szollosy indicated the "current medical date

6

1 encompasses a December 30, 2003 Medical Consult Response authored by Dr. Stevens with an
2 attached Medical Consultant Review-[PCE]." (AR 0610.)

3       38.    Szollosy summarized Dr. Stevens' findings regarding Plaintiff's functional capacities
4 and concluded that Plaintiff "is employable at this time within her own occupation." (AT 0613.)

5       39.    Szollosy noted the Department of Labor characterizes the Legal Secretary job "as a
6 sedentary job requiring "frequent" use of the upper extremities involving handling, [sic] and
7 fingering." Szollosy found that "those physical requirement are presently within [Plaintiff's]
8 functional capacities." (AR 0612.)

9     **D.**    **Denial of Benefits**

10       40.    On February 23, 2004, Prudential informed Plaintiff it would terminate her LTD
11 benefits effective May 1, 2004 because Prudential "determined that [Plaintiff] no longer satisf[ied]
12 the . . . policy definition of *disability*." Prudential relied on medical records provided by Dr.
13 Billings, Coleman, Dr. Chu, and a physician consultant file review. Prudential acknowledges
14 Plaintiff experienced a relapse of pain and swelling in February 2000 when she attempted to return
15 to work at Coblentz in the IT department part-time but informed Plaintiff that "based upon the
16 pertinent medical and vocational documentation contained in your claim file, we have determined
17 that you retain the capacity to perform the material and substantial duties of your occupation." (AR
18 0602, 0604.) Plaintiff filed a timely appeal of this termination decision.

19       **1.**    **Wilhelmina Korevaar, M.D.**

20       41.    On August 5, 2004, Wilhelmina Korevaar, M.D. wrote a "consultant response" at the
21 request of Prudential. Dr. Korevaar analyzed the PCE form filled out by Dr. Stevens on December
22 30, 2003 and the FCE performed by Steven Moon on July 26 and 27, 2004.  (AR 0539.)

23       42.    Dr. Korevaar ultimately concluded that the 2003 PCE was "an accurate reflection of
24 [Plaintiff's] capabilities for full time gainful employment." (*Id.*)

25       43.    Dr. Korevaar analyzed Plaintiff's behavior during the July 26, and July 27, 2004 FCE
26 as follows:

> Although the therapist interpreted her behavior as
> consistent with putting forth a maximum effort, careful
> review of the data, including heart rate responses and
> Jamar dynamometer testing indicates less than

7

> maximum effort. The behavior that the therapist used to gauge her maximum effort was terms "competitive" but could be construed as cheating (starting timed tests early, asking for extra time to practice, etc.). She demonstrated the capacity to walk more than 20 minutes at a time, and to sit doing the same tasks for more than 2 hours. In fact, the therapist had to limit full capacity testing on several tasks because she did not fatigue in the time normally allotted or each test during functional capacity evaluation.

(*Id.*)

### 2. Steven Moon

44. In his FCE report, Moon had indicated Plaintiff "was very cooperative and participated eagerly with all tasks" and that her behavior during testing "indicate[s] an individual who is trying to score well upon testing." (AR 0546.)

45. On the first day of testing, Moon had indicated Plaintiff's "hand volumetric measurements" were 375 ml and 360 ml respectively for her right and left hands pre-testing and 410 ml and 380 ml respectively post testing. (AR 0546.)

46. On the second day of testing, Moon indicated Plaintiff's "hand volumetric measurements" were 390 ml and 400 ml respectively pre-testing and 380 ml and 390 ml post testing. Moon notes that a 5-10 ml difference is "considered insignificant." (AR 550.)

47. At the beginning of the second day, Plaintiff reported soreness and indicated her pain levels were severe. (AR 0549.)

48. During a typing test on the second day, Plaintiff was unable to type for more than ten minutes and began to cry. Moon halted testing at this time. Plaintiff completed ninety minutes of testing on day two. Plaintiff reported her pain levels had increased to "very severe levels" and Moon indicates she "did appear to be in discomfort." (AR 0552.)

49. Finally, Moon observed Plaintiff was able to endure 2.75 hours of testing the first day and ninety minutes of upper extremity use the second day. He concluded that Plaintiff "demonstrates the ability to perform in the light work level" with the following limitations: "no climbing, stooping, power grasping or walking greater than occasional, no upper extremity use greater than frequent, an employee paced position and the ability to take 1-2 minute micro breaks as needed for symptom control." (AR 0544, 0552.)

8

50.     In his report, Moon admitted he was not provided with a job description but states "it would seem unlikely that Plaintiff could return to her previous type of employment." (AR 0544.)

51.     Prudential later provided a generic job description from the Dictionary of Occupational Titles to Moon. In a letter dated August 31, 2004, Moon indicated that Plaintiff "meets the general strength and positional tolerances as define within it. Ms. White would still need the general limitations and accommodations as outlined in the original report." (AR 0224.)

### E.     Denial of Plaintiff's First Appeal

52.     In response to Plaintiff's first appeal, Prudential indicated its initial decision was appropriate. In a letter dated September 15, 2004, Prudential wrote that it "concluded that there is no indication of an impairment documented in the medical records which would prevent Ms. White from performing the duties of a Legal Secretary. We have concluded that the physical capacities as indicated via the July 2004 FCE, including activities as needed involving Ms. White's upper extremities, are consistent with the requirements of the occupation of a Legal Secretary." (AR 0221.)

### F.     Denial of Plaintiff's Second Appeal

53.     Again, Plaintiff appealed the decision and as a result, Prudential requested updated medical records from Dr. Billings and Coleman, Plaintiff's acupuncturist. In a letter dated April 21, 2005, Dr. Billings indicated he reviewed: (1) the appeal recommendation from Prudential dated August 11, 2004; (2) the consultant response from Dr. Korevaar; (3) the PCE form filled out by Dr. Stevens in December 2003; (4) the FCE performed by Moon on July 26, and 27, 2004. (AR 0124.)

54.     In that letter, Dr. Billings offered the following opinion on Plaintiff's ability to return to work: "Having already returned the patient to her usual and customary work one occasion and then having to treat the results of that activity over a six-month period, it is my opinion that reinventing the wheel is not at all necessary. I anticipate that the patient will have another flare up very soon after returning to her usual and customary or similar work. Dr. Billings reconciled his opinion with the FCE and PCE by explaining that "on the occasions of testing and evaluation by other persons, Ms. White was at a level of maximum improvement from prior episodes and therefore did not, at any time, show the findings, which I have seen so frequently." He added: "I do not think

9

that any of these testing periods accurately demonstrate the problems that I have seen so often as I have treated Ms. White during the past several years." (AR 0124-0125.)

55. In a letter dated March 15, 2005, Coleman offered the following opinion on Plaintiff's ability to return to work:

> When she exacerbates her condition with activities such as mopping, carrying groceries etc., acupuncture along with rest and ice is able to get her back to a manageable state again. How long it takes her to get back to a manageable state depends upon the severity of the exacerbation. Sometimes, it can take a couple of weeks. At other times, it can take a couple of months. To reiterate, I am talking about activities that a normal person takes for granted. With this in mind, it is my professional opinion that Patricia cannot return to her former employment."

(AR 0148.) Coleman also reported treating Plaintiff on March 3, 2005, for tenderness, swelling and pain in her hands after Plaintiff mowed her lawn. (*Id.*)

### 1. Philip Marion, M.D.

56. On August 1, 2005, Philip Marion, M.D., completed a file review at Prudential's request. Dr. Marion indicated that Plaintiff "does not have functional impairment(s) from May 1st, 2004 forward." Dr. Marion noted a normal neurological examination, electrodiagnostic evaluation of the upper extremities and radiological findings that showed chronic degenerative spine disease without evidence of significant herniated disc disease or nerve root impingement. Marion found that "the lack of objective impairment does not support any specific restrictions and/or limitations as of May 1st [sic], 2004 in terms of the claimant's ability to sit, stand, walk, lift, reach, and carry." (AR 0011.)

57. In response to Plaintiff's second appeal, Prudential again upheld the termination of Plaintiff's benefits in a letter dated August 2, 2005. Prudential found that a file review "notes that the lack of objective impairment does not support any specific restrictions and limitations, and that Ms. White can perform her job." The file review found the following were normal: "neurological examination and electrodiagnostic findings of the upper extremity, and radiological findings of chronic degenerative spine disease with no evidence of significant herniated disc disease or nerve root impingement."

10

**II.     Conclusions of Law**

58.     As both parties acknowledge, the Court reviews Prudential's decision denying Plaintiff's benefits claim *de novo*. *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 111 (1989).

59.     ERISA authorizes suits against fiduciaries and plan administrators in order to remedy breach of fiduciary duty. 29 U.S.C. § 1109. Participants in a plan covered by ERISA can file suits to "recover benefits due . . . under the terms of the plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B).

60.     Plan administrators are required to provide a clear accounting of why benefits were denied and a "full and fair review" of any denial of benefits. 29 U.S.C. § 1133.

61.     In reviewing Prudential's decision, the Court has the power to award disability benefits to Plaintiff or to remand the case to the Plan Administrator for further factual development. *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 951 (9th Cir. 1993).

62.     On *de novo* review, a district court may "in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has a 'greater opportunity to know and observe the patient' than a physician retained by the plan administrator." *Jabian v. Hewlett-Packard Co.*, 349 F.3d 1098, 1105 (9th Cir. 2003) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).

63.     A claimant need not present clinical or diagnostic evidence to support the severity of her pain. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990) (observing that "it is the very nature of excess pain to be out of proportion to the medical evidence").

64.     It is the very nature of pain that it cannot be easily measured or proven. *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir.1986) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.")

65.     The parties agree that Plaintiff meets the second and third requirements of Total Disability under the Plan. The parties dispute the first requirement of whether Plaintiff can perform the "material and substantial duties" of her "own occupation."

11

66.     As evidence of her inability to perform the material and substantial duties of her "own occupation," Plaintiff cites her failed attempt to return to work in 2000 resulting in a "flare-up" that required six months of intensive treatment from Dr. Billings and Coleman to quiet.  Since then, Plaintiff has experienced flare-ups of various durations as a result of mowing her lawn, sweeping her porch, and gardening.  She has not returned to work since 2000.

67.     Prudential contends that it properly terminated Plaintiff's LTD benefits effective May 1, 2004 because the medical documentation in the record did not support a continuing impairment that would prevent her from performing the duties of her "own occupation."

68.     In the termination letter, Prudential relies on Dr. Stevens' opinion that Plaintiff could do sedentary to light level work with certain upper extremity limitations, which was based on his review of Plaintiff's medical records and Dr. Chu's examination.  Prudential does not offer any explanation reconciling the 2000 flare-up with Dr. Stevens' suggestion Plaintiff could return to full-time work in 2004.

69.     Plaintiff claims that Prudential failed to adequately account for Plaintiff's attempt to return to work in 2000 in the IT department and her subsequent flare-up and offered no valid support for the notion that a return to her former position of legal secretary would produce a different result.

70.     In support of her position, Plaintiff contends Prudential improperly relied on Dr. Chu's report.  Plaintiff attacks the report's adequacy since Dr. Chu never analyzes Plaintiff's ability to grip, grasp, or type and instead merely opines on Plaintiff's ability to lift, carry, stand, sit, walk, and reach.  Plaintiff argues Dr. Chu never reached Plaintiff's ability to perform the duties of a legal secretary and that Dr. Chu's omission, as a result, severely weakens the credibility of Dr. Stevens, who relied on Dr. Chu, and opined that Plaintiff could frequently perform activities such as: (1) handling/grasping; (2) fingering; (3) feeling; and (4) pushing/pulling.

71.     The Court agrees with Plaintiff.  Prudential cannot adequately support its contention that the medical documentation in the record supported a finding that Plaintiff could return to her own occupation.  To the contrary, the evidence in the record in February 2004 supported a finding of a continuing impairment that would prevent Plaintiff from performing the duties of legal secretary.

72.     Dr. Stevens' opinion is not corroborated, and at times is contradicted, by the other

evidence in the record. First, Dr. Stevens writes in his report that Plaintiff is able to cook. However, Coleman, in an entry dated March 11, 2002, writes that Plaintiff "did a lot of cooking last couple days - pretty sore arms, shoulders, wrists - some welling hands and wrists." One week later, Coleman reports Plaintiff had difficulty with her ability to grasp and "really feels like the cooking was too much for her." (AR 344.) Second, Dr. Stevens writes in his report that Plaintiff is able to garden. However, Coleman, in an entry dated April 1, 2002 writes that as a result of gardening Plaintiff was "tight, sore, swollen in wrists." (AR 345.) Third, Dr. Stevens reports that Plaintiff can mop. On May 23, 2002, Coleman notes Plaintiff's "arm hurts from mopping." (AR 348.) And on July 17, 2003, Coleman reports Plaintiff's "hands, wrist, left should sore - mopped floor." (AR 358.)

73.   Dr. Stevens never acknowledges or reconciles several key pieces of evidence with his opinion that Plaintiff can perform certain activities. Specifically, Dr. Stevens never acknowledges Plaintiff's attempt to return to work for twenty hours per week and the resulting flare-up and six months of intensive treatment. He is unable to reconcile his opinion that Plaintiff can frequently grasp and finger with Coleman's report on December 23, 2002 that Plaintiff "was on the computer - hands feel sore" (AR 349) and again on January 13, 2003 "everything is hurting again - to [sic] much trying to use computer." (AR 350.)

74.   Furthermore, there is the nothing in the record to support that Dr. Stevens, as an endocrinologist, is competent to opine on the Upper Extremity Repetitive Stress disorder at issue. Similarly there is no evidence that Dr. Stevens could credibly opine that Plaintiff can frequently handle/grasp, finger, feel, or push/pull without performing a physical or other functional examination

75.   In its letter dated September 15, 2004, Prudential denied Plaintiff's second appeal stating there was no evidence in the record indicating Plaintiff could not perform the duties of a legal secretary. Prudential argues the July 2004 FCE concluded Plaintiff had the capacity perform sedentary to light capacity work, although Prudential admits that during the examination Plaintiff was unable to type for longer than ten minutes.

76.   Prudential also claims that Dr. Billings, Plaintiff's primary-care physician, agreed

13

with the normal objective findings documented by Dr. Chu.  However, Dr. Billings ultimately rebuts Dr. Chu's and Dr. Stevens' assessments in a letter dated May 12, 2004.  Dr. Billings states that Plaintiff cannot frequently handle/grasp, finger, feel, push, or pull.   He cites her failed attempt to return to work, coupled with intermittent flare-ups, as evidence that Plaintiff cannot perform the duties of legal secretary without severe consequences.

77. Prudential also relied on the opinion of its doctor, Dr. Korevaar, who reviewed the FCE and opined that Plaintiff was not putting forth maximum effort even though Moon, who actually administered the FCE, indicated her behavior was consistent with putting forth maximum effort.

78. Reviewing Prudential's September 2004 letter denying Plaintiff's second appeal in light of the foregoing evidence, the Court disagrees with Prudential's bases for denying Plaintiff's LTD benefits.  Particularly, in its letter Prudential indicates that the July 2004 FCE indicates Plaintiff's abilities were consistent with working full-time as a legal secretary.  In the FCE, Moon reports Plaintiff could only type for ten minutes before she started to cry and stopped the typing test. Prudential used the FCE and Moon's report to determine that Plaintiff was not totally disabled.  In addition, the Court relies on the opinion of Dr. Billings, Plaintiff's primary-care physician, who repeatedly indicated Plaintiff could not return to her occupation as a legal secretary without severe physical consequences as supported by the flare-up experienced in 2000 when she attempted part-time work and the subsequent flare-ups that occurred after performing routine housework for short periods of time.  Furthermore, the Court notes that Coleman's notes, who has treated Plaintiff since 2003, corroborate Dr. Billings observations and that he similarly concludes Plaintiff cannot return to work as a legal secretary.  Based on the evidence detailed above, the Court finds Prudential's determination to be in error.

**III. Conclusion**

For the foregoing reasons, the Court **FINDS** that Plaintiff has demonstrated that she is disabled under the terms of the Plan as to her "own occupation" of legal secretary and is entitled to LTD benefits from May 1, 2004 through the Initial Duration of a period of Total Disability as described by the Plan.  The Court does not reach the issue of whether Plaintiff meets the

14

requirements of disability based on whether or not she has the capacity to perform "any occupation" or whether Plaintiff is disabled under the Plan outside the Initial Duration of a period of Total Disability.

The Court declines to rule on Plaintiff's request for a specific award of past benefits, pre-judgment interest, and attorneys' fees and costs. The parties shall meet and confer within two weeks of the filing date of this Order, and shall submit to the Court a stipulated agreement on the amount of payments owed. If after the meet and confer session, the parties fail to reach an agreement on the amount of payment due, Plaintiff may file a brief not exceeding three pages in length calculating the amount of benefits she claims are owed and addressing whether awards of pre-judgment interest, costs, and attorneys' fees are appropriate. Prudential may file an Opposition, not exceeding three pages, no later than ten days after Plaintiff files her Brief.

**IT IS SO ORDERED.**

Dated: May 17, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE